Edward Earl JOHNSON,
Petitioner-Appellant,

v.

Donald CABANA, Acting Commissioner, Mississippi Department of Corrections, Respondent-Appellee.

No. 87–4380.

United States Court of Appeals,
Fifth Circuit.

May 19, 1987.

Robert B. McDuff, Washington, D.C., Clive A. Stafford Smith, Atlanta, Ga., for petitioner-appellant.

Marvin L. White, Jr., Asst. Atty. Gen., Jackson, Miss., respondent-appellee.

Before CLARK, Chief Judge, REAVLEY and WILLIAMS, Circuit Judges.

PER CURIAM:

In this appeal from the denial of his third petition for federal habeas corpus relief based on claimed violations of the Constitution of the United States, Edward Earl Johnson seeks to interdict the writ of the Supreme Court of Mississippi ordering his execution on May 20, 1987. After considering the pleadings in all of the successive collateral proceedings instituted in the Supreme Courts of the United States and of the State of Mississippi, the United States District Court for the Southern District of Mississippi, and this court, we conclude that Johnson's present counsel have failed to raise any new or different issues which indicate that Johnson failed to receive a basically fair trial of his guilt and punishment. We further conclude that Johnson's claim that his present mental condition proscribes his scheduled execution or entitles him to a hearing on the issue is insufficient. We therefore affirm the district court's denial of habeas corpus relief for the reasons stated in that court's opinion in addition to the various particular reasons set out below.

Through counsel who have not previously appeared on his behalf, Johnson asserts

the following list of constitutional infirmities that rendered his trial and sentence fundamentally unfair:

(A) His trial counsel were ineffective.

(B) His prior habeas corpus counsel were ineffective.

(C) An instruction of the trial court created a mandatory presumption that improperly shifted the burden of proof to him.

(D) The prosecution concealed the fact that a biased juror failed to disclose her bias.

(E) A statement taken from Johnson violated his right to counsel under the sixth and fourteenth amendments.

(F) It would violate the eighth amendment to execute Johnson because he was only 18 years old at the time of the crime.

(G) The Mississippi capital statute under which Johnson was tried is unconstitutional on its face because it limits the mitigating circumstances he could develop for the jury.

Johnson also claims that he lacks present sanity—a condition which would prohibit his execution under the eighth amendment and under Mississippi law. Alternatively, Johnson claims he made a showing which entitled him to a hearing on this issue.

Johnson's prior federal habeas corpus proceedings are reported at 623 F.Supp. 1121 (S.D.Miss.1985) and 806 F.2d 1243 (5th Cir.1986). These prior reports detail Johnson's criminal activity, his trial, and his prior collateral attacks upon his conviction and sentence. The history of Johnson's legal activities following his trial and sentence shows the following. He opted not to file a petition to the Supreme Court of the United States seeking a writ of certiorari to the Mississippi Supreme Court, but rather filed applications for a writ of habeas corpus, both pro se and by counsel, with the United States District Court for the Southern District of Mississippi. His execution was stayed. The petitions were consolidated and dismissed for failure to exhaust available state remedies. *Johnson v. Thigpen,* No. J82–0523(R). Johnson's counsel next filed an application for a writ of error coram nobis with the Mississippi

Supreme Court. This was denied. *Johnson v. Thigpen,* 449 So.2d 1207 (Miss.1984). Then followed a second petition for habeas corpus relief in the district court, 623 F.Supp. at 1121, an appeal of its denial to this court and our affirmance, 806 F.2d at 1243, the denial of panel and en banc rehearing, and a petition for a writ of certiorari to this court in the United States Supreme Court. Following the Supreme Court's denial of relief, *Johnson v. Thigpen,* —— U.S. ——, 107 S.Ct. 1618, 94 L.Ed.2d 802 (1987), the Mississippi Supreme Court on April 22 set a new execution date for May 20, 1987.

Collateral proceedings in that Court and in the district court followed. On May 13, 1987, Johnson filed a motion for post-conviction relief and stay of execution with the Mississippi Supreme Court. The court denied the motion on May 18th. Meanwhile, Johnson filed his current petition for writ of habeas corpus with the United States District Court on May 15th. On May 19th, the district court concluded that a stay was not necessary to consider the claims and evidence presented and denied Johnson's petition. The district court did, however, grant Johnson's application for certificate of probable cause. This appeal then ensued and Johnson has moved this court to stay his execution. Pursuant to the rules and practices of this court, this panel has received and reviewed all pleadings, exhibits, and orders filed in Johnson's collateral attacks in the Supreme Court of the State of Mississippi and the United States District Court contemporaneously with their filing.

I. *Present Sanity—Right to a Hearing*

In *Ford v. Wainwright,* —— U.S. ——, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986), the Supreme Court held that a defendant who could not perceive the connection between his crime and punishment should not be executed. The court further held that where psychiatric testimony indicated that the defendant believed that his death penalty had been invalidated, he was entitled to have the issue of his sanity resolved by hearing before he could be executed. In

the present collateral proceeding Johnson's new counsel exhibit affidavits of a clinical psychologist who has recently examined him, a psychiatrist who evaluated him in 1979, and acquaintances who describe various character traits which they observed prior to his trial. The state counters with affidavits from a forensic psychologist, psychiatric progress notes prepared by a licensed psychologist who has visited with Johnson in recent days, and affidavits of the acting commissioner of the Department of Corrections and the acting superintendent and institutional chief of security of the penal institution where Johnson is incarcerated.

In *Ford* the plurality opinion of four justices was made a majority holding by the concurring opinion of Justice Powell. In that pivotal opinion Justice Powell states a precise formula for determining what process is due a petitioner in this situation.

> [T]he State has a substantial and legitimate interest in taking petitioner's life as punishment for his crime. That interest is not called into question by petitioner's claim.... [T]his Court's decisions imposing heightened procedural requirements on capital trials and sentencing proceedings ... do not apply in this context.
>
> ... [I]n order to have been convicted and sentenced, petitioner must have been judged competent to stand trial, or his competency must have been sufficiently clear as not to raise a serious question for the trial court. *The State* therefore *may properly presume* that *petitioner remains sane* at the time sentence is to be carried out, *and may require a substantial threshold showing of insanity merely to trigger the hearing process.*
>
> ... [T]he sanity issue in this type of case does not resemble the basic issues at trial or sentencing. Unlike issues of historical fact, the question of petitioner's sanity calls for a basically subjective judgment.... [U]nlike the determination of whether the death penalty is appropriate in a particular case, the competency determination depends substantially on expert analysis in a discipline fraught with "subtleties and nuances."

> This combination of factors means that ordinary adversarial procedures—complete with live testimony, cross-examination, and oral argument by counsel—are not necessarily the best means of arriving at sound, consistent judgments as to a defendant's sanity.
>
> ... [A] constitutionally acceptable procedure may be far less formal than a trial. The State should provide an impartial officer or board that can receive evidence and argument from the prisoner's counsel, including expert psychiatric evidence that may differ from the state's own psychiatric examination. Beyond these basic requirements, the States should have substantial leeway to determine what process best balances the various interests at stake. As long as basic fairness is observed, I would find due process satisfied, and would apply the presumption of correctness of § 2254(d) on federal habeas corpus.

*Id.* at 106 S.Ct. at 2610–11 (citations and footnote omitted) (emphasis added). In following these guidelines, we first would note that the following matters are disclosed by the record which was presented to the Supreme Court of Mississippi and to the district court.

Timothy Summers, a psychiatrist, averred that he had conducted an evaluation of Johnson in 1979 prior to Johnson's trial for capital murder. At that time he found Johnson had an alcohol dependency and at times suffered from alcoholic blackouts and episodes of amnesia. He was of the opinion that Johnson, who was a premature baby, had had some brain damage from birth. His preliminary diagnosis was that Johnson suffered from brain dysfunction, which was exacerbated by alcoholic intake. He stated that drinking alcohol caused Johnson to suffer organic brain syndrome, which had the effect of substantially lessening the ability to control his behavior.

Gilbert Macvaugh, Jr., a clinical psychologist who examined and tested Johnson over a five-hour period on May 11, 1987, swore that Johnson suffered an alcohol dependency problem which caused his think-

ing to be grossly disorganized at times. At the time of the commission of the crime in 1979, Johnson's alcohol-related organic brain condition would have rendered him unable to control his behavior or appreciate the consequences of his acts. Macvaugh's evaluation of Johnson demonstrated to him that Johnson was on a "flight into unreality insofar as his acceptance of his impending execution." "He appears to be too calm and too much in control ... [to] appreciate the gravity of his situation." Johnson's present condition "may severely impair his ability to discuss his case sensibly with his attorneys and offer them useful information." "[Johnson] does not understand why he is being singled out and does not have the proper mental framework to come to grips with his own conscience." Macvaugh was of the opinion that Johnson's condition was the product of mental disease or defect.

Johnson's maternal grandmother swore that when he was a child he used to hear female voices and would sit and stare off into space, requiring that he be called several times to get his attention. He had trouble sleeping as a child. She never saw him drink any kind of alcoholic drink. The affidavits of other relatives and friends reveal that Johnson had been an average student, had worked steadily prior to the crime, had purchased a car, had lots of girlfriends, and liked and played sports.

The state filed with these courts the affidavit of forensic psychologist Charlton Stanley. Based upon Stanley's review of the progress notes of prison psychologist Michael Whelan, the affidavits of Macvaugh, Summers and numerous relatives and attorneys, which were attached to the petitioner's pleadings in the Mississippi Supreme Court, "relevant" portions of the trial transcript and pretrial hearings, and the medical records of Johnson's two evaluations at the Mississippi State Hospital prior to his trial, Stanley concluded that Macvaugh's opinions were incorrect or in error. Stanley stated that his psychological evaluation of April 30, 1980, showed no hint of organic brain syndrome or other condition that would impair Johnson's judgment. He attributed Johnson's actions to Johnson's own sociopathic personality. Stanley stated that as of April 30, 1980, testing showed no psychotic disorganization or other mental illness. With regard to Macvaugh's assertion that Johnson was on a "flight into unreality" regarding acceptance of his impending execution, Stanley averred that such an attitude was consistent with sane psychological preparation for death. On this basis, he contradicted Macvaugh's deductions from Johnson's calmness and control because he thought they could be based upon a rational acceptance of his impending death. Stanley discounted Macvaugh's conclusions of manic and schizophrenic characteristics, stating they represented a naive interpretation of test data and were inconsistent with recent clinical history and Stanley's prior test data. This same background formed Stanley's basis for rejecting Macvaugh's conclusions that a mental disease or condition impaired Johnson's ability to discuss his case with a new attorney. Stanley concluded that Johnson's psychiatric and psychological history revealed him to be a sociopath whose anti-social personality prevented him from learning from experiences that would teach others because people with such anti-social personalities tend to blame others for their predicament. Stanley stated that such personality disorders are not considered mental diseases or defects.

Stanley accepted Dr. Summers' assertion that Johnson was an alcoholic who suffered from alcoholic blackouts and amnesia. Based upon the affidavits of teachers and others who had known Johnson, Stanley concluded that Dr. Summers was in error in believing that Johnson had suffered impairing brain damage from birth, since Johnson displayed no learning disability or organic brain syndrome in connection with his performance as a student. Stanley further concluded that Johnson was patterning his behavior on that of Jimmy Lee Gray, a prisoner whom Johnson had observed on the day of Gray's execution to be so calm as to appear to be on medication (which prison records showed was not correct). Stanley recalled that both of Johnson's maternal grandparents had been in-

terviewed extensively as a part of the intake process at the time of Johnson's evaluation by the Mississippi State Hospital, that neither grandparent had mentioned that Johnson "heard voices" as a child despite specific questions regarding any previous hallucinations. He further concluded that since most family and acquaintances observed Johnson to behave quietly and with reservation from childhood, that Johnson's present quiet, reserved attitude was compatible with his case history.

The courts also had before them the affidavits of prison officials and the psychiatric progress notes, which revealed that Johnson's responses to a broad range of inquiries were normal and rational, for example, that he fully understood his execution was imminent, that he continued to express hope for some reprieve, that he had selected the menu for his last meal, and that he had spoken with a television crew which had visited the penitentiary and interviewed him about his status.

The Mississippi Supreme Court overruled Johnson's motion to strike the state's affidavits but found it unnecessary to consider them because Johnson had failed to make out a prima facie case of present insanity by his affidavits. The precise holding was that Johnson "failed to establish a reasonable probability that he is presently insane," citing *Billiot v. State*, 478 So.2d 1043 (Miss.1985), which held that petitioner failed to demonstrate insanity had occurred after the trial and conviction at which his sanity had been determined. Billiot "failed to establish to a reasonable probability that he was presently insane." *Id.* at 1045. *Billiot* controls the case as regards the Summers affidavit, which was based on and dealt only with Johnson's pretrial condition.

The Mississippi Supreme Court's ultimate finding was that Johnson's proof fell short of the evidentiary showing he was required to make under Miss.Code Ann. § 99–19–57(2)(b) (Supp.1986), and *Ford.* The provisions of Mississippi law applicable to the determination of supervening insanity are:

(2)(a) If it is believed that a convict under sentence of death has become insane since the judgment of the court, the following shall be the exclusive procedural and substantive procedure. The convict, or a person acting as his next friend, or the commissioner of corrections may file an appropriate application seeking post conviction relief with the Mississippi Supreme Court. If it is found that the convict is insane, as defined in this subsection, the court shall suspend the execution of the sentence. The convict shall then be committed to the forensic unit of the Mississippi State Hospital at Whitfield. The order of commitment shall require that the convict be examined and a written report be furnished to the court at that time and every month thereafter stating whether there is a substantial probability that the convict will become sane under this subsection within the foreseeable future and whether progress is being made toward that goal. If at any time during such commitment the appropriate official at the state hospital shall consider the convict is sane under this subsection, such official shall promptly notify the court to that effect in writing, and place the convict in the custody of the commissioner of corrections. The court shall thereupon conduct a hearing on the sanity of the convict. The finding of the circuit court is a final order appealable under the terms and conditions of the Mississippi Uniform Post-Conviction Collateral Relief Act.

(b) For the purposes of this subsection, a person shall be deemed insane if the court finds the convict does not have sufficient intelligence to understand the nature of the proceedings against him, what he was tried for, the purpose of his punishment, the impending fate which awaits him, and a sufficient understanding to know any fact which might exist which would make his punishment unjust or unlawful and the intelligence requisite to convey such information to his attorneys or the court.

Miss.Code Ann. § 99–19–57(2) (Supp.1986).

■ Justice Powell's opinion tells us that the state is not required to resolve

Johnson's claim by a formal trial. The Supreme Court of Mississippi certainly provides an impartial tribunal. It received Johnson's affidavits and the brief of his counsel and counsel for the state. Evaluation of the lay and expert psychiatric evidence was suitable to the exigencies created by Johnson's successive petition for collateral relief. The threshold question was one that called for the exercise of basically subjective judgment which had to depend upon expert analyses in a discipline fraught with subtleties and nuances. Given the situation in this case, ordinary adversarial procedures would not have provided any better means of arriving at a sound, dependable judgment as to whether Johnson had made a prima facie or "substantial threshold" showing that since the date of his trial he had become insane as that term is defined in § 99–19–57(2)(b). Macvaugh's statement that Johnson had flown into unreality regarding his impending execution because he appeared too calm and too much in control to appreciate the gravity of his situation is double-speak, not expert evidence that he lacked sufficient intelligence to understand the nature of the proceedings, the purpose of his punishment, and the impending fate which awaits him, and the Supreme Court could so assess it. This psychologist concluded only that Johnson's present condition *"may"* impair his relations with his counsel. This showing does not come close to establishing that Johnson lacks a sufficient understanding to know what facts might help his case or the requisite intelligence to discuss them with his counsel. Indeed, the very existence of Johnson's own affidavit could be taken as disproving this. We therefore find that constitutional due process was satisfied and the determination of the Mississippi Supreme Court that its statutory threshold had not been reached is entitled to the presumption of correctness provided by 28 U.S.C. § 2254(d). We further find that the merits of this threshold determination are more than authenticated when the counter-affidavits and information supplied by the state, but not considered by the Mississippi Supreme Court, are reviewed by us.

## II. *The Standard for Gauging Successive Applications*

A successive habeas corpus petition in this court may be dismissed if it fails to allege new or different grounds for relief or if the failure to assert such grounds in a prior petition constitutes an abuse of the writ of habeas corpus. *Barefoot v. Estelle,* 463 U.S. 880, 103 S.Ct. 3383, 3395, 77 L.Ed.2d 1090 (1983); *see* Rule 9(b) of the Rules Governing Section 2254 Cases; *Sanders v. United States,* 373 U.S. 1, 8, 83 S.Ct. 1068, 1073, 10 L.Ed.2d 148 (1963).

## III. *Ineffective Trial and Habeas Corpus Counsel*

In his prior collateral proceeding Johnson made detailed attacks on numerous facets of his guilt and punishment trials, including an attack on the state's capital punishment statute as applied. New habeas counsel now assert that trial counsel furnished Johnson ineffective assistance and that prior habeas counsel failed in their duty to present this ineffectiveness because trial counsel continued to represent Johnson in the prior collateral attack.

This court judicially knows that the representation of a person charged with a capital offense imposes the heaviest professional responsibility known to the practice of law. Common experience and prior precedent demonstrates that collateral review of death penalty verdicts frequently include sixth amendment attacks on the effectiveness of previous counsel. *See, e.g., Gray v. Lucas,* 710 F.2d 1048, 1061 (5th Cir.1983).

■ We conclude that the prior habeas corpus proceedings in Johnson's case clearly demonstrate a thorough, vigorous, diligent, intelligent group of attacks on numerous aspects of the proceedings underlying the writ of execution. Doubtless a fifth set of counsel could comb this record, suggest still more issues that could have been raised, and point the finger of incompetency at today's new lawyers. We look past such speculation to the record of Johnson's trial and sentencing and conclude

that under the standards established by the Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), trial counsel brought to bear such skill and knowledge as was needed to render Johnson's trial a reliable adversarial testing process. Such errors, mistakes, acts, or omissions as counsel made or committed did not deprive the proceeding of its indicia of fairness and reliability. Thus, they did not prejudice defendant.

"[E]ffective counsel is not 'errorless counsel, and not counsel judged ineffective by hindsight, but counsel reasonably likely to render and rendering reasonably effective assistance.'" *Johnson v. Estelle,* 704 F.2d 232, 239 (5th Cir.1983) (quoting *MacKenna v. Ellis,* 280 F.2d 592, 599 (5th Cir. 1960)). This is the test we apply to the work of counsel at trial. While its sixth amendment applicability to private, retained counsel in collateral proceedings may be doubtful, *Gray v. Lucas,* 710 F.2d at 1061, the district court considered the effort of habeas counsel with regard to whether those efforts were ineffective so as to excuse the presentation of issues now raised for the first time. *Daniels v. Blackburn,* 763 F.2d 705, 710 (5th Cir.1985); *Jones v. Estelle,* 722 F.2d 159, 167 (5th Cir.1983).

■ The state reminds us that Johnson has been represented in prior post-trial proceedings by counsel other than those who conducted the trial. They assert that James Robertson, now a justice of the Mississippi Supreme Court, represented Johnson on direct appeal. Barry Powell alone represented Johnson in his coram nobis proceeding. Our records show Kenneth Rose to have been associate counsel in the appeal from the first denial of habeas corpus relief. The state intimates that it is deceptive for Johnson's present counsel to assert that Powell's affidavit shows he violated his duty as a lawyer when he concealed his determination to spare his habeas co-counsel, R. Jess Brown, the embarrassment Brown now so willingly assumes under oath. The district court refused to accept Powell's explanation of his reluc-

tance to pursue trial counsel's incompetency. That finding is not clearly erroneous in light of Powell's statement to the district court in Johnson's second federal habeas that he had raised all grounds of which he knew in his many, detailed assertions of constitutional error which he advanced in his representation of Johnson. Johnson does not mention the failure of attorney Rose or Justice Robertson to join in this claimed default. However, since this case involves capital punishment, we choose not to rely upon the successive nature of the proceedings or to accept the state's claim that this contention is a sham. Rather, we proceed to examine the merits of the claims of ineffective assistance under the tests laid down in *Strickland,* and *Johnson v. Estelle.*

■ Johnson's initial assertion of incompetency asserts that his trial counsel failed to present evidence of Johnson's mental condition because of a mistaken belief that the proof of insanity had to meet the *M'Naghten* rule requiring inability to differentiate right from wrong. Trial counsel have sworn that they made this legal mistake in their representation. They further declare that they did not believe Dr. Summers' conclusions met *M'Naghten.* Johnson also complains that trial counsel failed to prove Johnson was a premature baby whose baby sitter did not properly feed him, nor did they prove that he heard female voices, or suffered from insomnia, or would stare off into space, or that he had an alcohol intoxication disorder. Johnson's new counsel assert the failure to offer this proof at the sentencing phase of his trial violated Johnson's sixth amendment rights to effective assistance of counsel. Some cases in this circuit, on initial application for habeas relief, have viewed a counsel's total failure to call mitigation witnesses as rendering the trial of the defendant unfair. However, this is a successive petition, and trial counsel for Johnson did call mitigation witnesses in the punishment phase of the trial. Counsel also urged the jury to consider Johnson's background, his youth, and his consumption of alcohol. The fact that they did not go into Johnson's mental capacity may be explained by the fact that

they knew there had been a prior sanity examination which furnished the state with substantial proof that Johnson was sane. Reasonable trial strategy clearly dictated this was not an issue to try to develop with the jury in Johnson's case. *Strickland* teaches that "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." 466 U.S. at 690, 104 S.Ct. at 2066. Present habeas counsel have offered no proof that rebuts this presumption.

■ Johnson next asserts that trial counsel erred in believing that they were limited to statutory mitigating circumstances and both trial counsel have sworn they held this mistaken belief of law. Johnson's new counsel files affidavits demonstrating that his family and friends would have spoken well of Johnson, would have praised his worth as an individual, would have told the jury of instances of aberrational behavior, would have testified to their love for him, and would have described their reluctance to see him die. Counsel for the state point out that the trial transcript discloses that one of Johnson's trial counsel argued to the court that the defense was not limited to statutory mitigating circumstances. The court so instructed the jury. The transcript also discloses that counsel forcefully argued to the jury Johnson's youth and the fact that alcohol impaired his judgment on the evening of his murder of Marshal Trest. Given these facts, we doubt this error occurred. If it did, it certainly was not prejudicial.

■ Johnson next argues that his counsel was incompetent because they missed two hearings during the pretrial phase of his trial. The State details that one such hearing was February 19, 1979. At that time, the court's only action was the entry of a ruling which granted Johnson's motion for a sanity examination. The state points out that the judge could have ruled in writing, that arguments of counsel had already taken place, and that the ruling granting Johnson's motion could not have prejudiced Johnson. The second missed hearing was June 16, 1980. The purpose of that hearing was a conference about setting the date of trial. The state asserts that at the time the case was called, counsel for Johnson announced ready without reservation. Clearly, no prejudice has been shown by either of these omissions.

■ Johnson next contends that his counsel misadvised him regarding the consequences of a life sentence, which had been offered as a part of a proposed plea bargain by the prosecutor. Johnson's new counsel assert and his trial counsel swear that trial counsel told Johnson that the life sentence offered would be one without possibility of parole. Both Johnson and his trial counsel further swear that this bad advice was the sole consideration that kept him from accepting the plea bargain. They assert that the result of this advice was prejudice since Johnson received a death sentence. We disagree. The district court found that Johnson was never offered a plea bargain so prejudice could not have occurred. Assuming that a plea offer was made and that counsel's advice on the parole aspect of the prosecutor's life-sentence offer was in error (which raises a highly speculative issue in any event), no prejudicial error is demonstrated which deprived the trial of its fundamental fairness. Counsel did not fail to advise Johnson of the offer. The fact that a legal mistake resulted in an improper appraisal of parole consequences of this aspect of a rejected plea bargain is not the type of error that takes the representation outside the wide range of professionally competent assistance that *Strickland* would condemn.

■ Johnson's new counsel next assert that trial counsel failed to properly investigate his case. They show they were able to demonstrate that the brother of the slain Marshal Trest told an affiant, "Edward Earl [Johnson] couldn't have killed my brother." The irrelevance and inadmissibility of such a statement is obvious. No prejudice could have resulted to Johnson.

■ Johnson's final assertion of ineffective representation focuses on the argument made at the penalty phase of his case. He complains that one of his counsel

gauged the length of his argument so poorly that he ran out of time and was not permitted an extension to continue to make all the points he wished to cover. New counsel assert that the argument as made was inadequate. They further note that counsel discussed only Johnson's age at the time of his trial rather than his age at the time of the crime. To the extent that this issue was not dealt with in our prior opinion, we find it to raise no claim that prejudiced Johnson or arguably denied him a fair trial.

Assuming arguendo that the attorneys who previously represented Johnson in this court on the appeal of his prior habeas petition played false to their oaths to Johnson and to this court out of a false sense of deference to one of their co-counsel who tried the case and that such conduct excuses the otherwise clear abuse of the writ, we do not find any asserted conduct of trial counsel to rise to the level of ineffective assistance that denied Johnson a constitutionally fair trial.

### IV. *Improper Jury Instruction*

■ One part of the instructions of the trial court stated:

> Proof beyond a reasonable doubt ... of the statutory elements of the capital offense with which the accused is charged *shall* constitute sufficient circumstances to authorize imposition of the death penalty *unless mitigating circumstances shown by the evidence outweigh the aggravating circumstances.*

(emphasis added by petitioner.) New counsel assert that this instruction created a mandatory presumption that shifted the burden of proof to Johnson. They contend that under the "new law" announced in *Francis v. Franklin*, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985), this is impermissible. The state responds that *Franklin* announced no new rule, and that the instruction as given created no mandatory presumption. We agree with both positions. *Franklin* requires that the charge to the jury be read as a whole. *Id.*, 105 S.Ct. at 1973. When this is done, it is clear that the jury was told that they had to unanimously find beyond a reasonable doubt that at least one aggravating circumstance existed. They were further told they had to weigh that circumstance against all mitigating circumstances to determine punishment. Again, we hold that the jury was properly instructed in Johnson's case.

### V. *Misconduct by the Prosecutor*

Johnson's new counsel now contend that the prosecution knew that juror Leflore had a stepson in the county jail, yet did not disclose this knowledge to the defendant despite the fact that all jurors had indicated during voir dire that no member of their immediate families had been prosecuted or had had contact with law enforcement officials. Counsel assert that their subsequent investigation has shown that Leflore's stepson not only was then in custody but also was allowed to remain in the county jail and was never sent to the State Penitentiary. Counsel for Johnson assert that this indicates there must have been a deal with the prosecution which was covered up. The State responds that the questions asked the jurors by the district attorney during voir dire were at least ambiguous as they applied to Leflore since she was not in the initial group seated in the jury box to which specific questions were addressed, and that the details of her relationship to her stepson are not shown. The fact that her stepdaughter's affidavit is the source of the asserted misconduct between Leflore and the prosecutor is alleged by the state to raise questions about the closeness of that relationship. The state further asserts this court can know from other litigation that overcrowding at the State Penitentiary frequently requires that prisoners serve their entire sentence in county jail incarceration.

■ We conclude that this assertion of prosecutorial misconduct fails to demonstrate that Johnson was prejudiced, that the prosecutor knew that Leflore had any sort of connection through her stepson with law enforcement officials, or that there was indeed any such connection.

## VI. *Johnson's Confession was Obtained in Violation of the Sixth Amendment*

 Johnson asserts that at a time when he was the only suspect, when he was in custody, and after his family had told law enforcement agents that they wished to get Johnson an attorney, a statement was taken from him by officers. In this statement, Johnson implicated himself and gave officers sufficient information to enable them to recover Marshal Trest's gun that Johnson had used to murder the officer. Johnson's new counsel contend that the admission of this statement was obviously prejudicial. They further contend that *Michigan v. Jackson*, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986), constitutes new law in this area which excuses the failure to raise this contention previously. The state responds that *Jackson* is not new law, that it holds only that counsel should be made available after indictment and arraignment, that Johnson had neither been indicted nor arraigned at the time he confessed, that Johnson was not arrested until after he confessed, and that his confession was free and voluntary and was properly taken. We agree that *Jackson* did not create a new rule of law. Johnson's failure to raise this issue is an abuse of the writ. We further find that under the facts of this case Johnson was not entitled to have counsel present at the time he confessed.

## VII. *Mississippi Capital Penalty Statute is Unconstitutional*

 Johnson contends that § 99–19–101(6), Mississippi Code Ann. (Supp.1986), provides that mitigating circumstances "*shall* be the following." Such language is said to express a limitation on mitigating circumstances in violation of new law set out in *Hitchcock v. Dugger*, —— U.S. ——, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987). The State responds that the statute has never been interpreted as limiting mitigating circumstances and was not so interpreted in Johnson's case. The instructions of the court contained several mitigating circumstances not listed in the statute. *Hitchcock* is not applicable to this case. Any error in the statute's phraseology caused no prejudice to Johnson. The failure to raise the issue in a previous collateral proceeding was an abuse of the writ.

## VIII. *Youth of the Defendant*

The final contention of Johnson's new counsel is that the eighth amendment's prohibition of cruel and unusual punishment bars Johnson's execution since he was only 18 years of age when he murdered Marshal Trest. They point out that he was not even old enough to serve on a jury in Mississippi and contend the pendency of *Thompson v. Oklahoma*, 724 P.2d 780 (Okla.Cr.1986), cert. granted, —— U.S. ——, 107 S.Ct. 1284, 94 L.Ed.2d 143 (1987), requires that a stay of execution be entered until the Supreme Court's decision is rendered. The state responds that *Thompson* involved a crime committed by a fifteen-year-old and does not apply to Johnson's case.

 The issue was clearly presented by the proof and argument at the trial of the case. It should have been raised in some of the various collateral attacks already mounted in this case. To have held it back for this present effort is an abuse of the writ. We would also note that this circuit has already rejected an eighth amendment claim by a defendant who was seventeen years old at the time of his crime. *Prejean v. Blackburn*, 743 F.2d 1091, 1098–99 (5th Cir.1984). Johnson's claim, as an eighteen-year-old, clearly fails under *Prejean*.

## IX. *Internal Rule 2 of the Southern District of Mississippi*

 The district court granted Johnson's application for certificate of probable cause but denied his motion for a stay. As Johnson's counsel correctly points out, this is inconsistent with Internal Rule 2, formerly Local Rule 23, of the Southern District of Mississippi and the Rules of the Fifth Circuit which require that a stay be granted when a certificate of probable cause is issued. In this case, however, the district court's mistake is harmless error because we have examined and considered the ruling of that court, and affirm the district court's denial of habeas relief.

The district court erred in granting the certificate of probable cause. We refuse to issue such a certificate. The district court's denial of habeas corpus relief to Edward Earl Johnson is AFFIRMED. The Motion of Edward Earl Johnson for a stay of the writ of execution issued by the Mississippi Supreme Court is DENIED.